# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs September 9, 2003

## EDDIE HOWARD PITTMAN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. C02-131     Roger A. Page, Judge**

---

### No. W2002-02892-CCA-R3-PC  - Filed March 18, 2004

---

The petitioner, Eddie Howard Pittman, appeals from a judgment denying post-conviction relief.  As grounds for a new trial, the petitioner asserts that he was denied the effective assistance of counsel at trial and that there was error in the instructions to the jury.  The judgment is affirmed.

### Tenn. R. App. P. 3; Judgment of the Trial Court Affirmed

GARY R. WADE, P.J., delivered the opinion of the court, in which JERRY L. SMITH, J., joined.  JOE G. RILEY, J., filed a dissenting opinion.

J. Mike Mosier, Jackson, Tennessee, for the appellant, Eddie Howard Pittman.

Paul G. Summers, Attorney General & Reporter; Brent C. Cherry, Assistant Attorney General; and Alfred L. Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The forty-six-year-old petitioner was initially charged with attempted first degree murder, aggravated burglary, aggravated assault, felony possession of a weapon, aggravated kidnapping, and aggravated rape.  Gregory Luster was the victim of the first four charged offenses and his wife, Becky Luster, was the victim of the latter two charges.  After a preliminary hearing at which Ms. Luster, who had apparently been romantically involved with the petitioner for some time, testified that although she had had sex with the petitioner, she did not consider herself to have been raped, the kidnapping and rape charges were dismissed.  At trial, the state presented evidence that the petitioner unlawfully entered the victim's residence, confronted the victim, fired a gun in his direction, and forced the victim's wife to drive him from the scene.  The petitioner contended that because he had been involved in an affair with the victim's wife, the victim had fabricated the charges as an act of retaliation.  At the conclusion of the jury trial, the petitioner was convicted of attempted second degree murder and felony possession of a weapon.  The trial court ordered consecutive sentences of twelve years and six years, respectively.  This court affirmed on direct appeal.  See State v. Eddie Howard Pittman, No. W2000-01582-CCA-R3-CD (Tenn. Crim. App.,

at Jackson, Sept. 7, 2001). Our supreme court denied application for permission to appeal on February 11, 2002.

This case is complicated. The record contains portions of the preliminary hearing, the trial testimony, and, of course, the evidentiary hearing on the petition for post-conviction relief. Because the outcome hinges largely on the credibility of the victim and the petitioner and because of the relationship between the petitioner and the victim's wife, the victim's first official report of the offense is of some significance. In a handwritten statement[1] dated May 20, 1999, at 8:40 a.m., the victim provided the Jackson Police Department with the following information:

> On May 20, 1999 I was at home with my wife Becky Luster. Around 6:30 a.m. me and Becky left the house and got into my car 1987 Chevrolet 4 door in the back yard. I looked and saw a police officer talking to some one in the parking lot west of my house.
> Becky carried me to work at the new school on Arlington Street behind [illegible] Middle School.
> When I got to work my car was smoking and I asked my boss if I could take a few minutes to go and check on my car.
> We left and went to Walgreen and bought a loaf of bread and came back home. Becky parked in front of the house. I got out and started around the house and I saw [the petitioner] standing in my front door looking out. I walked to the front door and aske[d] [the petitioner what was he doing in my house. [The petitioner] said that Ni**er I am going to kill you because you have messed up my life. I looked and saw that [the petitioner] had a gun in his hand. [The petitioner] walked out on the front porch. He told me that he was going to kill me and pointed the gun at me and it clicked. The gun did not shoot. I talked to him and I opened the door and jumped into the house and he fired a shot at me. Becky was still standing in the street. I looked out and saw [the petitioner] grab[] Becky and put the gun to her head and force[d] her into my car and I saw her leave in the car. I don't know how [the petitioner] got into my house.
> [The petitioner] had a silver type handgun.

In a written statement given on the same day at 9:30 a.m., Becky Luster provided the following report to the police:

> Me [and] my husband, getting ready to go to work. My husband took out some garbage. He saw a car that [the petitioner] be driving in a parking lot near by. My husband . . . come back in [and] told me he saw that car that [the petitioner] was driving [and] thinks he was in it.

---

[1]The handwritten statement of the victim does not appear to have been made an exhibit at trial but, along with the statement of the victim's wife, Ms. Luster, appears as an exhibit to the post-conviction hearing transcript.

We left [and] I took [the victim] to his job. He got out. He talked to his supervisor about getting the car checked out. It was smoking under the hood. We drove back to the house to check to see if everything was alright. We saw that the car was still in the parking lot. I did not see anyone in the car.

We parked in the street in front of our house. [The victim] got out [and] then I got out. [The victim] had went up to the front porch. I saw [the petitioner] coming out the front door. He had a gun in his hands. I was still on the street. I heard a gun shot. [The victim] had tried to get in the house where [the petitioner] couldn't hurt him.

I was screaming at [the petitioner] to go on [and] not to start stuff. He came off the porch [and] put the gun on me. He made me get in the car [and] drive. He got in with me.

I drove down Airways [and] out in the country. That's where he told me to go. We turned down by the Airport. We went out on a country road. We stopped. He got under the wheel [and] said he would drive. We drove to Roy Gray's house. He got out. I stayed in the car. He talked to Roy. He got back in the car.

He drove down a little road. He forced me to have sex with [him]. We left [and] went back over to Roy's house. He got out again. He was talking to Roy. I got out to see what they were talking about. Roy said he was coming to town [and the petitioner] was going to ride with Roy.

I was trying to get [the petitioner] to just let me go. I began crying [and] he jumped on me [and] began hitting me in the face with his fist. We were outside the car. Roy was watching him hit me. Roy told him not to act like that because his mama was in the house sick.

He quit hitting me [and] told me to calm down. He told me he was sorry.

He got back in my car. I was driving. Roy was following us. I drove back to Westover Rd. He got out [and] got into the car with Roy.

I drove straight to the police station.

He still had the gun in his pants.

The only time he pointed the gun at me was when he made me get in the car at my house.

At the preliminary hearing on December 30, 1999, the assistant district attorney reported that the case had been scheduled for a preliminary hearing on two prior occasions and the state witnesses did not appear, resulting in a dismissal of the warrants. Later, the case was submitted to the grand jury, resulting in a true bill of indictment. A motion to dismiss the indictment under Rule 5(e) of the Rules of Criminal Procedure was filed because the petitioner was not afforded a preliminary hearing. The State agreed to a preliminary hearing and the defense agreed to withdraw their motion to dismiss the indictment.

At the hearing, the victim testified that he had known the petitioner for years and that the petitioner was the ex-boyfriend of his wife, whom he had married in the prior year. He related the events leading up to the offense as follows:

-3-

I got up that morning to go to work, and . . . my car was smoking, so I go to my job and told my boss man that I need to take my car to the shop, I went with my wife to where she work at, cause it was smoking a[] little bit, I told him I'd be back in 45 minutes to an hour. He said "okay". So, I got in the car and stop at the gas station and they checked the car out and everything. I told her to stop at Walgreens, and bought a loaf of bread and got in the car. And . . . we pulled up at the house, I asked her, "what you doing leaving the door open?, "why's the door open?". She said, "I didn't leave the door open". And I said, "park right here". So I got out of the car and everything . . . .

\*　　　\*　　　\*

I . . . walked up on the steps and . . . that's when I found [the petitioner] in my house. I said, "what are you doing in my house, man?"

\*　　　\*　　　\*

Then, he opened my door. And I said "man, what are you doing over my house, man?", he opened the door and everything and came on out, I looked over beside him and he had a gun [in his hand], I said "God", you know.

\*　　　\*　　　\*

And . . . while he opened the door and everything, I always leave my key in the [outer iron] door . . . and he opened the door and came on out.

\*　　　\*　　　\*

[A]nd then he said "man, why you go and marry my woman? And this-n-that, and I said "I don't know what you're talking about, man, like that."

\*　　　\*　　　\*

Yeah, he said "you messed up my life", you know, that kinda stuff. So he point[ed] the gun at me and when he clicked it, . . . it didn't go off . . . .

\*　　　\*　　　\*

I just said, "Man, I don't know what you're doing, man", you know what I'm saying, I'm trying to get close to the phone, 'cause I already knew I was gone. I was trying to talk on the phone.

\*　　　\*　　　\*

I already knowed, I just had to take a chance, man. I ran into him, so we got to wrestling . . . with the gun, I said, "man the (unintelligible) one's for you". He had the hammer, I had the barrel of the gun, we wrestled about 4 or 5 minutes on the floor, and after that I couldn't get the gun out of his hand, so I pushed him off of me, he brought it back up again toward my head, and I jumped through the door.

According to the victim, his confrontation with the petitioner began at 6:45 a.m. He claimed that after he retreated into his residence, the petitioner again attempted to fire the gun at him, the gun discharged, and the bullet lodged in a wall. The victim testified that the petitioner then ordered Ms. Luster to drive him away from the scene. The victim stated that he started to intervene but chose not to take the "chance":

-4-

Well, I stood on the steps for a minute and I got to thinking, I said "I don't know what this fool is gonna do", you know, with her and everything, and I stood on the step and I got to thinking. So I walked up the street, I went by the school, when I got by the school, . . . I walked back down to the house and I walked back up again, I walked up by the Dodge store and I seen the police up there, and I told them I had a problem and everything, they asked me what your problem is, I said "this man kidnapped my woman", that's my wife. . . . I said "I didn't want to come to ya'll like this but you know, I got to come to you" . . . .

The victim related that later, police photographed his residence and, after informing him that his wife was at the police station, drove him there.

During the preliminary hearing, Becky Luster testified that her relationship with the petitioner had ended in approximately 1997, when he was incarcerated for an unrelated offense. She claimed that on the date of the charged offenses, the victim first struggled with the petitioner and then fled into their residence when the petitioner, who was armed, directed her to the car to drive. Ms. Luster stated that the petitioner had her drive into the country, stopping briefly at the residence of Roy Graves, before continuing down a road, where he "asked [her] to have sex, and [they] had sex." Ms. Luster testified that after intercourse, they returned to Graves' residence, where she pled for her release. She claimed that the petitioner struck her several times with his fists but returned her to Jackson as Graves followed in his own vehicle. Ms. Luster recalled that the petitioner stopped and got into Graves' vehicle and that she drove to the police station. Ms. Luster initially contended that the victim and the petitioner had never previously met or spoken with one another and that she did not know how the petitioner knew where she lived. Ms. Luster admitted having had consensual sex with the petitioner prior to his 1997 imprisonment but denied having renewed the relationship when he was released. She stated that even though she had the opportunity to drive away when the petitioner entered the Graves' residence, she chose not to do so because the petitioner was armed and might have shot at her. She acknowledged that when one of the officers asked that she submit to a medical examination, she declined "[b]ecause . . . to me, . . . it wasn't rape." At some point after the preliminary hearing, the charges related to Ms. Luster – aggravated kidnapping and aggravated rape – were dismissed by the state. The record indicates that at trial, no evidence was presented about the alleged rape and kidnapping.

At trial, the victim testified that on May 20, 1999, Ms. Luster, who typically drove him to work and then returned to their residence to get ready to be at her job by 8:00 a.m., stopped at her place of employment between 6:15 and 6:30 a.m. Because of engine trouble, the victim received permission to leave his workplace for thirty to forty-five minutes to arrange for repair of the vehicle. He claimed that after a mechanic quickly repaired the car, he chose to stop at Walgreen's with Ms. Luster before returning to their residence at between 7:15 and 7:30 a.m. The victim claimed that when they arrived, their front door was open. He testified that as he approached the house, he saw the petitioner, whom he had not seen in years, standing inside a locked outer iron door. The key to the iron door was in the lock on the inside of the door. According to the victim, the petitioner, who was holding a "silver-type handgun," walked onto the porch and said, "'Man, what are you doing

marrying my woman? You know that's my woman.'" The victim replied, "Man, I don't know what you talking about," as the petitioner pointed the gun at the victim's forehead and pulled the trigger. The victim claimed that when the gun did not fire, he attempted to wrest it away from the petitioner and they struggled on the porch for four or five minutes while, according to the victim, the petitioner repeatedly said, "'I'm going to kill you.'" The victim testified that when he was unable to gain possession of the gun, he pushed the petitioner away and opened the iron door. He claimed the petitioner again pulled the trigger, this time firing a shot that went through the front door glass, lodging in a wall. Upon hearing the shot, the victim "fell in the floor." Later, a spent bullet was recovered from the wall by police.

According to the victim, Ms. Luster remained outside during the confrontation. He claimed that petitioner threatened to kill her and again pointed the gun in his direction. The victim then retreated to the residence as the petitioner and Ms. Luster left in the vehicle. After contemplating his course of action, the victim walked to a nearby store where he reported to a police officer that his wife had been kidnapped. The victim estimated that an hour had passed before he contacted the police. He explained that he did not have a phone in his residence. The victim acknowledged that on the day following the offenses, when he saw the petitioner board a city bus, he instructed Ms. Luster, who was driving their car, to follow. The victim admitted boarding the bus and confronting the petitioner, who refused to respond, before he was ordered to deboard by the bus driver.

The victim, who had been previously convicted of possession of heroin with the intent to sell, receiving a ten-year prison sentence, also had a prior conviction for possession of hydromorphone with the intent to sell for which he had received a six-year sentence. At the time of trial, he was on parole.

Officer Ted Maxwell of the Jackson Police Department testified at trial that he photographed the victim's residence and recovered a spent bullet from a wall in the front room. The officer did not testify as to what caliber weapon fired the bullet. There were no shell casings found at the scene.

Lieutenant Michael Holt of the Jackson Police Department testified that as the unit supervisor, he assigned the case to Investigator Doris Jackson, who had since retired. He indicated that his involvement with this case was to apprehend the petitioner, who was eventually arrested in Westland, Michigan, on November 17, 1999, almost six months after the incident.

Henry Cunningham, a Jackson Transit Authority bus driver, recalled that on the day after the charged offenses, the petitioner had boarded his bus and sat down in the rear. He testified that when he stopped at a traffic light, the victim knocked on the door and, upon being admitted to the bus, made threatening remarks to the petitioner. Cunningham remembered instructing the victim, who initiated the altercation, to leave the bus.

During the trial, the petitioner claimed that the victim fabricated the charges after learning of his relationship with Ms. Luster. He testified that he first dated Becky Luster in 1992 and later

shared a residence with her until he violated his parole and was returned to prison in 1997. The petitioner insisted that Ms. Luster had visited him while he was in prison and that they resumed their romantic relationship when he was released. He claimed that on each morning, after taking the victim to work, Ms. Luster would either meet him at his residence or that he would go to the residence she shared with the victim. The petitioner testified that on the morning of May 20, he drove his brother's car to Ms. Luster's residence and parked in a church parking lot, as was his custom. He recalled that a police officer approached his vehicle and questioned him. When he explained that he was waiting on a friend, the officer asked for identification and patted him down, finding no weapons. The petitioner stated that he also gave the officer permission to search his vehicle. According to the petitioner, the officer informed him that neighbors had complained about his parking in the lot and that he would have to leave. Because he did not have a driver's license, he chose to leave on foot. The petitioner contended that Ms. Luster, who saw him as she returned to her residence, then picked him up in her vehicle. The victim was not present. He claimed that after he explained what had happened in the parking lot, Ms. Luster drove him to the residence of Roy Graves, who had agreed to help him find a construction job. The petitioner denied that he was in the Luster residence on May 20. He contended that he did not see the victim at any time that morning and denied carrying a gun or firing shots at the victim. He acknowledged that on the following day, he was riding on a bus when the victim stepped on board and threatened to kill him for "messing with" his wife. The petitioner insisted that he had last seen the victim on April 18, when he went to the victim's residence and informed him that he and Ms. Luster had resumed their relationship. He testified that the victim ordered him to leave the property and then fired a gun into the ground as a warning. The petitioner testified that he then telephoned 911 from a pay phone and reported the incident. He claimed that he waited for a police cruiser but none arrived.

Upon this evidence, the jury returned guilty verdicts for attempted second degree murder and felony possession of a weapon. The other charges were dismissed. This court affirmed on direct appeal. The petitioner then filed a pro se petition alleging that he had been denied the effective assistance of counsel. The post-conviction court appointed counsel and allowed an amendment of the petition asserting that the trial court had erred by failing to charge the jury on attempted voluntary manslaughter as a lesser included offense of attempted first degree murder.

At the evidentiary hearing, trial counsel testified that he was an assistant public defender when he was appointed to represent the petitioner in March of 2000. He recalled that the petitioner was initially charged with attempted first degree murder, aggravated burglary, rape, and possession of a weapon but that the rape charge was later dropped. Trial counsel remembered that he had discussed the nature of each charge with the petitioner, the possible penalty ranges if convicted, and the plea offer made by the state. He contended that he had attempted to interview all of the potential witnesses from the list provided by the petitioner and had inspected the scene of the crime. Trial counsel specifically recalled that the petitioner had "maintained his innocence" and had rejected the state's offer, contending that the victim's claims were fabricated. Trial counsel testified that while he was aware that the petitioner had prior convictions that would be admissible for impeachment purposes, he considered the petitioner's testimony necessary to contradict the victims' version of the events. It was his opinion that the trial "was basically going to be a matter of credibility." Trial

counsel testified that upon reviewing the case file in preparation for his testimony at the hearing on the post-conviction claims, he became aware for the first time that a police officer had searched the petitioner shortly before the offense and had found no weapons. He could not remember having interviewed the officer, but agreed that his testimony would have corroborated somewhat the petitioner's claim that he was unarmed.

According to trial counsel, the state's discovery material did not include the prior convictions of the victim or other of the prosecution's witnesses. He recalled that through his own investigation, he had discovered that the victim had prior felony drug convictions that were admitted on cross-examination for impeachment purposes. Trial counsel confirmed that charges as to the female victim, Becky Luster, were dropped prior to trial because she had retreated from her claim that the petitioner had raped her. Trial counsel testified that he had interviewed the victims, but did not attempt to separately interview Ms. Luster, who, appeared to be "under the dominion and control" of her husband. Trial counsel acknowledged that the petitioner wished to call Ms. Luster as a witness at trial. He explained that he did not subpoena her because he "did not know what she was going to say, and [because, during his pretrial interview] she seemed to stick with Mr. Luster in all respects at all times." He recalled that the defense did present the testimony of the bus driver who verified that the victim was the aggressor in a confrontation on his bus.

Officer Terrence Smith of the Jackson Police Department testified that in May of 1999, at approximately 6:30 a.m., he encountered the petitioner after responding to a call regarding a suspicious vehicle in a church parking lot. He remembered that he inspected the petitioner's identification, checked for any outstanding warrants, and conducted a pat-down search for weapons. It was Officer Smith's recollection that he did not search the petitioner's vehicle. He did not find any weapons.

Evelyn Donita Shaw, the petitioner's sister, testified that at the petitioner's request, she telephoned trial counsel and asked to be subpoenaed so that she would be excused from her employment for the trial. She contended that she had informed trial counsel that she had telephone bills that demonstrated that in the weeks and months after the offense, Becky Luster had telephoned her at her residence in Michigan. Ms. Shaw claimed that Ms. Luster "was calling and talking to [the petitioner], wanting to come to Michigan where the petitioner was." She testified that Ms. Luster told her that she wanted "to be with" the petitioner and that the petitioner "didn't do it." Ms. Shaw stated that she was not called to testify as a defense witness at trial.

Eugenia Pharmer, another of the petitioner's sisters, testified that she spoke with the victim at her residence after the preliminary hearing and that the victim indicated that he had not intended for the prosecution to go "this far . . ., but he couldn't back out of it because if he did, they was going to get him for false something." She claimed that she had provided this information to trial counsel prior to the trial.

The petitioner testified at the evidentiary hearing that he met with his trial counsel three or four times before the trial and had also spoken with him by telephone. He described trial counsel

as "hostile" both in their meetings and over the phone, claiming that trial counsel "threatened to walk out" of the trial if the petitioner did not testify. The petitioner contended that he had informed trial counsel about having been stopped and patted down by Officer Smith on the morning of the offense but that trial counsel responded that the "Jackson Police Department don't keep records of that," claiming that he was unable to "find anything." According to the petitioner, he did not wish to testify at trial but was pressured into doing so by trial counsel, who insisted that he needed to tell his "side of the story," notwithstanding the prior convictions for which he would be subject to cross-examination. He claimed that trial counsel had agreed to call Ms. Luster as a hostile witness after receiving phone records demonstrating that she had telephoned Ms. Shaw after the offense, but that he failed to do so. The petitioner indicated that his brother's car had been impounded after the pat-down by Officer Smith and that when the lead investigator, Doris Jackson, released it, she told his brother that "something about [the victim's] story is not adding up." He stated that although both he and his brother conferred with trial counsel about Officer Jackson's comments, she was not called to testify at trial. During cross-examination, the petitioner acknowledged that he did not know of any of the victim's neighbors who could have been called to testify that they had not heard a gunshot on the morning of the offense.

Becky Luster, who did not testify at trial, did not testify at the post-conviction hearing. Nor did the petitioner's brother or Officer Jackson.

Without addressing the petitioner's claims individually, the post-conviction court denied the petition, stating as follows:

All matters of which Petitioner complains are either matters of trial strategy or would not have garnered information helpful to the Petitioner's case. [Trial counsel] did a reasonable amount of preparation in this case. The witnesses who were not called would likely have been unfavorable to the Petitioner. . . .

Even if this Court assumes that counsel was [deficient in performance], Petitioner has shown no prejudice and has not convinced this Court that the outcome would have been any different. This case was one of credibility of the witnesses . . . .

I

Initially, the petitioner asserts that he was denied the effective assistance of counsel at trial because trial counsel failed to move for a mistrial after testimony regarding the petitioner's prior incarceration, failed to call favorable witnesses to testify, and failed to adequately investigate the case.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given were below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936

(Tenn. 1975). Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693 (1984). Should the petitioner fail to establish either factor, he is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a [petitioner] must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

On claims of ineffective assistance of counsel, the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Under our statutory law, the petitioner bears the burden of proving the allegations in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-210(f). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998). Claims of ineffective assistance of counsel are regarded as mixed questions of law and fact. State v. Honeycutt, 54 S.W.3d 762, 766-67 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). On appeal, the findings of fact made by the post-conviction court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. Brooks v. State, 756 S.W.2d 288, 289 (Tenn. Crim. App. 1988). The burden is on the petitioner to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978). The credibility of the witnesses and the weight and value to be afforded their testimony are questions to be resolved by the trial court. Bates v. State, 973 S.W.2d 615 (Tenn. Crim. App. 1997). When reviewing the application of law to those factual findings, however, our review is de novo, and the trial court's conclusions of law are given no presumption of correctness. Fields v. State, 40 S.W.3d 450, 457-58 (Tenn. 2001); see also State v. England, 19 S.W.3d 762, 766 (Tenn. 2000).

The petitioner first argues that trial counsel was ineffective for failing to move for a mistrial when it was revealed during the testimony of the victim that the petitioner had previously been incarcerated. The record reflects that during cross-examination, the victim agreed that he had not

seen the petitioner in several years and stated that he knew the petitioner "was in Cooke."[2] The victim also denied having ever shot at the petitioner, contending that he "didn't know [the petitioner was] out of prison." Finally, the victim acknowledged that he had previously spoken to the petitioner over the telephone: "I talked to him while he was in th[e] penitentiary. He called [Ms. Luster's] house."

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. See Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The decision whether to grant a mistrial is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." Id. The authority to discharge a jury is to be exercised only when there is a cogent reason or manifest necessity. Jones v. State, 218 Tenn. 378, 403 S.W.2d 750, 754 (1966).

In our view, the record does not preponderate against the post-conviction court's finding that trial counsel was not deficient in his performance for failing to move for a mistrial. The victim's references to the petitioner's prior incarceration, while prejudicial, would not have given rise to a "manifest necessity" to stop the trial. No further information regarding the petitioner's criminal history or prior bad acts was provided to the jury. Although it would have been appropriate for trial counsel to have sought a curative instruction, it is unlikely that a mistrial would have been granted. Additionally, by testifying, the petitioner subjected himself to cross-examination regarding four prior theft convictions. On direct examination, while providing the jury with background information concerning the nature of his relationship with the victim's wife, the petitioner testified that she had visited him while he was incarcerated. Thus, the jury was fully aware that the petitioner had prior convictions.

The petitioner next contends that trial counsel was ineffective for failing to call as witnesses his sisters, Evelyn Shaw and Eugenia Pharmer. He claims that the testimony of Ms. Shaw would have corroborated his romantic involvement with the victim's wife and that Ms. Pharmer's testimony would have served to impeach the victim. At the post-conviction hearing, trial counsel was not asked to explain why these witnesses were not produced at trial. As indicated, the burden is on the petitioner to prove his allegations in a clear and convincing fashion. See Tenn. Code Ann. § 40-30-210(f).

Both witnesses claimed to have talked with trial counsel and both were present at the trial. Ms. Shaw was subpoenaed by the defense. Ms. Shaw would have testified to her belief that the petitioner was involved in a romantic relationship with the victim's wife, who telephoned the petitioner at her residence in Michigan during the weeks and months after the offense and before the arrest. Although the petitioner has not established that any of Ms. Luster's comments to Ms. Shaw would have qualified as an exception to the rule against hearsay, see Tenn. R. Evid. 801, 802, the

---

[2]"Cooke" is not identified further in the record, but is presumed to be a correctional facility.

testimony of Ms. Shaw might have been marginally helpful to the defense. That Ms. Luster repeatedly telephoned the petitioner after the offense would have corroborated the defense theory that the petitioner and Ms. Luster were having an affair and that the victim had a motive to retaliate in some manner. The testimony of Ms. Shaw would have also demonstrated that the victim's wife had knowledge of the petitioner's whereabouts, which might have rebutted testimony that the police did not arrest the petitioner immediately after the offenses because his whereabouts were unknown. No such evidence was offered by any other witness.

Ms. Pharmer would have offered testimony that the victim had reservations about the prosecution. She could have confirmed his desire to recant but for fear of repercussions. Although such testimony would have qualified as hearsay, its admission may nevertheless have been required by due process. See State v. Brown, 29 S.W.3d 427, 434-35 (Tenn. 2000). Additionally, the statements to Ms. Pharmer would have had some impeachment value and could have been proved by extrinsic evidence had the defendant denied them during cross-examination. See Tenn. R. Evid. 613. Given the nature of this case as a swearing match between the victim and the petitioner, the testimony of Ms. Pharmer might have offered helpful information for the defense.

On the other hand, that the victim's wife still pursued the petitioner after his departure from this jurisdiction does not mean that the shooting incident never occurred. That the victim's wife and the petitioner had a relationship is not inconsistent with the theory of the state. Moreover, the victim did not admit to Ms. Pharmer that he had fabricated the events of May 20, 1999. His statement was that the prosecution had proceeded far too long for him to recant his allegations and that he feared repercussions if he attempted to withdraw the charges. The victim did not admit that he had lied to police about the incident. Again, the burden in a post-conviction petition is to present clear and convincing evidence of deficiency in performance and prejudice in result. In our view, the failure to utilize the testimony of the two sisters, who would have appeared to have had a natural bias in favor of their brother, does not preponderate against the finding by the post-conviction court that trial counsel had met professional standards.

The petitioner also asserts that trial counsel was ineffective for failing to interview Officer Smith, failing to interview the victim's wife separately from the victim, and failing to canvass the victim's neighborhood for witnesses who would testify that they had not heard a gunshot on the morning of the offense. All would qualify as serious claims of deficiency on the part of trial counsel.

In our view, trial counsel should have interviewed Officer Smith, had he known about the pat-down search, and perhaps should have called him to testify as a witness at trial. Trial counsel testified that he was unaware of Officer Smith's involvement until just before he testified at the post-conviction hearing. While he agreed that the officer's testimony would have benefitted the defense, the post-conviction court nevertheless ruled that any failure of performance by the failure to discover and produce Officer Smith at trial was not prejudicial. As indicated, Officer Smith did not search the petitioner's car. The petitioner had the opportunity to arm himself after the officer left and before he was seen by the victim inside the residence of the victim. If it was his custom to meet Ms. Luster each morning after the victim went to work, he likely had full access to the residence. Our scope of

review is too narrow to speculate that the testimony of the officer might have changed the verdict. Officer Smith testified at the post-conviction hearing that at approximately 6:30 a.m. in May of 1996, he responded to a dispatch regarding a suspicious vehicle in a church parking lot. He encountered the petitioner, checked the petitioner's identification, checked for any outstanding warrants, and conducted a pat-down for weapons. Although the officer's testimony at the post-conviction hearing did not include the date that he encountered the petitioner, the state concedes that it was the morning of the offense and both the victim and Ms. Luster told police in their handwritten statements that they had seen an officer in the parking lot that morning. Had Officer Smith been called as a witness, his testimony would have corroborated the petitioner's claim that he was waiting for Ms. Luster in a church parking lot and was most likely unarmed at the time. That would not, however, qualify as an alibi. Officer Smith's testimony would have established that there was approximately fifteen minutes between his encounter with the unarmed petitioner and the offense. The petitioner testified at the post-conviction hearing that his brother's vehicle was impounded and then later released to him by Officer Doris Jackson. Neither the petitioner's brother nor Officer Jackson were called as witnesses to substantiate the claim. Had the vehicle been impounded from the church parking lot, any testimony concerning the circumstances of the impoundment and how the vehicle was secured might have been helpful. Yet the petitioner is not entitled to a new trial based upon such speculation.

The petitioner also claims that trial counsel was ineffective for failing to interview the victim's wife separately from the victim. In that regard, however, the petitioner has failed to prove any resulting prejudice. According to trial counsel, he did not attempt to interview Ms. Luster separately even though he believed her to be "under the dominion and control" of the victim. While trial counsel should have attempted to interview Ms. Luster independently of the victim in order to test her veracity and commitment to the victim's version of the events, there is little indication that the failure to do so was so critical as to call into question the verdict of the jury. In Ms. Luster's handwritten statement to police, she related that the victim, who claimed not to have seen the petitioner in years, was able to identify both the petitioner and a vehicle that he was known to have been driving. She repeatedly stated that the petitioner was armed and fired a shot at the victim. She also stated that she and the victim drove back to their residence "to check to see if everything was alright," perhaps implying an anticipated confrontation with the petitioner. Nevertheless, the petitioner has failed to prove that the outcome of the trial would have been any different had trial counsel interviewed her separately from the victim. Trial counsel testified that Ms. Luster sat with the victim during the trial and appeared "to stick with [the victim] in all respects at all times." The petitioner chose not to call Ms. Luster as a witness at the post-conviction hearing. There is no indication that she was separately interviewed prior to the evidentiary hearing on the post-conviction claim. When a petitioner contends that trial counsel failed to discover, interview, or present a witness in support of his defense, he should present that witness at the evidentiary hearing. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

Likewise, it is our conclusion that the petitioner has failed to demonstrate that trial counsel was ineffective for failing to canvass the neighborhood for witnesses who would testify that they had not heard a gunshot on the morning of the offense. The petitioner has failed to identify any witnesses that counsel should have found or to set forth the testimony they may have offered. See id. The

record supports the post-conviction court's conclusion that trial counsel was not deficient in this regard.

Next, the petitioner argues that trial counsel was ineffective for failing to fully investigate the criminal record of the victim and for failing to impeach the victim with his prior convictions for theft and fraud. At the post-conviction hearing, trial counsel testified that the state's discovery did not include information regarding the criminal records of any of the prosecution witnesses. Trial counsel conducted his own investigation for prior convictions of the victim, however, and was able to find two prior felony drug convictions that were used at trial to impeach the victim. The record on appeal includes a copy of the presentence report prepared in connection with sentencing on the victim's convictions for possession of heroin and hydromorphone. The victim's criminal record, which is lengthy, also included a February 1995 misdemeanor conviction for theft and a June 1990 misdemeanor conviction for fraud/breach of trust. Both of these convictions, which involved dishonesty and occurred within ten years of the victim's testimony, could have been utilized by the defense to impeach the victim. See Tenn. R. Evid. 609(a) – (b). There were also convictions for petit larceny: one in 1988 when the victim was thirty-six; three in 1984 when the victim was thirty-one; and one in 1982 when the victim was twenty-nine. Although the petit larceny convictions were not necessarily admissible, trial counsel could nevertheless have sought to use them for cross-examination of the victim given that they were crimes involving dishonesty committed while the victim was an adult and that the case hinged on credibility. See Tenn. R. Evid. 609(b) ("Evidence of a conviction [greater than ten years old] is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence . . . and the court determines in the interests of justice that the probative value of the conviction . . . substantially outweighs its prejudicial effect."). Trial counsel, who did cross-examine the victim about two serious drug convictions, was not questioned at the evidentiary hearing regarding his knowledge of the additional offenses or whether he had obtained a copy of the presentence report, which is dated October 1, 1996. The record, however, reflects that the report was one of several documents, including the handwritten statements of the victim and Ms. Luster, that were submitted as exhibits after the evidentiary hearing. A cover letter from post-conviction counsel indicates that the petitioner "insisted that [he] ask [that the documents] be made a part of the record." Again, the burden is upon the petitioner to clearly and convincingly establish the validity of the claims. The manner in which this testimony was made a part of the record is not so persuasive as to overturn the rulings of the post-conviction court.

As indicated, trial counsel found the victim's two prior felony drug convictions. In our view, the record is not sufficiently developed to establish that trial counsel was ineffective for failing to discover the victim's prior convictions for theft and fraud or to cross-examine him at trial regarding those other crimes. Although the issue in this case was one of credibility, the jury saw and heard the witnesses firsthand. Later, the post-conviction court, having heard additional witnesses, rejected the petitioner's claims of deficiency in performance and prejudice in result. That the victim had a history of crimes involving dishonesty would have been relevant but to utilize the benefit of hindsight is not permitted in the post-conviction setting. A better developed record in the post-conviction proceeding might have tipped the scales more favorably to the petitioner. This court is not, however, persuaded that additional cross-examination on the additional prior offenses would have made a difference.

Finally, the petitioner contends that trial counsel was ineffective for failing to adequately confer with him regarding possible defenses. The record reflects that trial counsel met with the petitioner several times and also talked with him by telephone prior to the trial. Based on information provided by the petitioner, trial counsel interviewed prospective witness and inspected the scene of the offense. Trial counsel discussed with the petitioner the charges against him and the potential punishment ranges, as well as a plea offer by the state. He recalled that the petitioner rejected the offer because he maintained his absolute innocence. Trial counsel testified that he discussed potential defenses with the petitioner and stated that he was "sure" he discussed the petitioner's testimony with him prior to trial. Although the record reflects that there was some conflict between trial counsel and the petitioner, that does not mean that trial counsel was ineffective.

In State v. Zimmerman, 823 S.W.2d 220, 825 (Tenn. Crim. App. 1991), this court explained the Strickland test as follows:

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.
>
> As to the second component, there must be a reasonable probability that but for counsel's unprofessional error, "the result of the proceeding would have been different," not that it necessarily would have been different. The probable result need not be an acquittal. A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland.

(Citations and emphasis omitted.)

There is some legitimacy in the claims by the petitioner. Nevertheless, it is our view that the petitioner failed to clearly and convincingly establish that but for trial counsel's omissions, there was a reasonable probability of a more favorable result. The record does not preponderate against the trial court's finding that the petitioner was not deprived of the effective assistance of counsel.

II

The petitioner also contends that the trial court erred by failing to charge the jury on attempted voluntary manslaughter as a lesser included offense of attempted first degree murder. There is no allegation that trial counsel was ineffective for having failed to request the charge or raise the issue on direct appeal. The state contends that the evidence did not support such an instruction.

-15-

"A ground for [post-conviction] relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-206(g). Because the petitioner failed to raise this issue in his direct appeal, it cannot provide a grounds for relief in this post-conviction proceeding.

Accordingly, the judgment is affirmed.

_____
GARY R. WADE, PRESIDING JUDGE